UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILFRED L. HART | : |
| VS. | :   NO. 3:01CV2330(JCH) |
| EDWARD BLANCHETTE, M.D., ET AL. : | APRIL 19, 2004 |

## BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

This is a shocking case which graphically illustrates the barbarous and intentional denial of desperately needed medical treatment to an aged prison inmate serving a long sentence for child molestation.  The plaintiff entered the Connecticut prison system in the spring of 1990 at the age of 61.  Eight years later, in 1998, he began experiencing the symptoms of severe abdominal pain accompanied by uncontrollable vomiting and diarrhea.  Thereafter, these symptoms never abated.  They were documented consistently in the medical records of the Department of Correction.  Initially, medical personnel considered the possibility of either kidney stones or peptic ulcer.  Ulcer treatments had no effect and there never was any evidence of kidney stones.  The plaintiff repeatedly asked the medical staff to evaluate him for cancer.  He was ignored.

1

Defendant Blanchette, throughout these events, was the chief of medicine for the Department of Correction and supervised its physicians. He claims now that he did not become involved in the plaintiff's case until his abdominal cancer was diagnosed. The plaintiff's Department of Correction medical record shows that occurred on August 11, 2000. His record also shows, however, that defendant Blanchette in fact became personally involved in the plaintiff's case, and was briefed on it, at least as early as August 23, 1999 – a year before he claims he was involved.

Defendant Pillai went to work as a physician at the plaintiff's prison in January of 2000 and he says he became the plaintiff's personal prison physician in February of that year. He swears that he immediately reviewed the plaintiff's entire medical chart. Accepting that he did so, he clearly knew that from that moment that the plaintiff probably had cancer. He let him suffer for months thereafter.

The defendants have moved for summary judgment. They claim no involvement of significance with the plaintiff and further claim that the care Pillai gave the plaintiff was entirely acceptable. They offer no outside authority for this, but rely upon their own opinions. Their back-up position is that they are entitled to qualified immunity.

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits..., show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.

"In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant....Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002).

When the moving party "'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." Giannullo v. City of New York, 322 F.3d 139, 140-41 (2nd Cir. 2003), *quoting* Adickes v. S.H. Kress & Co., 398 U.S. 144, 158, 160 (1970). "[T]he moving party

bears the ultimate burden of establishing its right to summary judgment as a matter of law even when it does not have the ultimate burden of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 982 (10th Cir. 2003).

When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The evidence of the party against whom summary judgment is sought must be believed. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); United States v. Certain Funds on Deposit in Scudder Tax Free Investment Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable

inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997). "If reasonable minds could differ as to the import of the evidence...and if...there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." Id. at 59, quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988), and In re Japanese Elec Prods. Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from

which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997).  Citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"[T]he Second Circuit has cautioned that, in cases where motive, intent or state of mind are at issue, summary judgment should be used sparingly." Ruscoe v. Housing Authority of City of New Britain, 259 F. Supp. 2d 160, 166 (D. Conn. 2003) (Nevas, J.), *citing* Dister v. Continental Group, Inc., 859 F.2 1108, 1114 (2nd Cir. 1988).

The facts in this case, despite the strong language of the defendants' brief, are remarkably clear considering that the defendants have complete control of the written record.  The plaintiff has submitted, in addition to his own sworn original complaint herein, 42 pages of his DOC medical records.  These records demonstrate the callous indifference of the defendants to a severe medical condition of which they had actual knowledge.  Remember: (1) defendant Pillai admits that he read the plaintiff's entire chart in February of 2000 and (2) defendant Blanchette has been proven by that very chart to have been brought into the case personally in the summer of 1999.

As early as the first week of May, 1998, the plaintiff's medical records document that he complained of severe and persistent abdominal pain which was not in any way helped by ulcer medication. (Plaintiff's medical records, p. 1) As early as the first week of May, 1998, the plaintiff's medical records document that he alerted defendant Blanchette's medical staff to his concern that he was suffering from abdominal cancer. (Ibid.) As early as the second week of May, 1998, the plaintiff's medical records document that the position of the plaintiff's stomach "does not appear normal" and that there appeared to be "an extrinsic mass" in the abdomen. (Id. p. 2) In June of 1998, the plaintiff's medical records document his continuing complaints of severe and persistent abdominal pain with vomiting and diarrhea and his pleas that he was suffering from an extremely serious ailment. Those records further document that defendant Blanchette's medical staff were conferring about the plaintiff's medical complaints. (Id. p. 3) The plaintiff's medical records document that in June of 1998, the response of defendant Blanchette's staff to the plaintiff's complaints was to refer to the fact that he was a prisoner as a result of having been convicted of child molestation and the observation that the response to his medical complaints should be a mental health consultation. (Id. p. 4)

In January of 1999, the plaintiff's medical records document his continued complaints of severe abdominal pain and vomiting, the ineffectiveness of the

anti-ulcer medications being given him, his pleas to be hospitalized and that the response of defendant Blanchette's staff was to order him back to his cell. (Id. p. 5) In February of 1999, the plaintiff's medical records document that a radiological examination of the plaintiff's abdomen, coupled with his medical history, "raises concern for a mass." (Id. p. 6) The response of defendant Blanchette's staff was that if a single flat plate x-ray of the plaintiff's abdomen did not conclusively establish the existence of a mass, they would conduct no further examinations and continue the plaintiff on the anti-ulcer medication which the medical chart already established was ineffective. (Id. p. 7)

Defendant Blanchette was personally advised of the plaintiff's ongoing condition and medical problems at least as early as August 23, 1999. (Id. pp. 9, 11) On that same day, the plaintiff's medical records documented that he continued to suffer from severe abdominal pain with vomiting and diarrhea and that an increased dosage of the anti-ulcer medication had no effect upon his symptoms. (Id. pp. 10-12)

Dr. Blanchette was notified personally on August 23, 1999, that the plaintiff's abdominal pain was so severe that he had to be transported throughout the state in a desperate search for an available hospital bed. (Id. p. 11) Despite these grave medical conditions, and the fact that the plaintiff at the time was

seventy (70) years old, he was kept in a prison cell rather than in a hospital bed, a fact documented in his medical records. (Id. p. 13)

The plaintiff's excruciating pain, vomiting and diarrhea continued unabated as weeks became months of documented suffering. (Ibid.) The plaintiff repeatedly told medical staff that he knew he was suffering from cancer of the stomach and that fact was documented in his medical records. (Ibid.) The plaintiff's agonies continued unabated into the year 2000, a fact documented in his medical records. (Id. p. 15)

Defendant Pillai documented in the plaintiff's medical records on his very first visit with him that his symptoms went well beyond those of peptic ulcer and included "chronic diarrhea" over a period of years. (Id. p. 16)

In the summer of 2000, the plaintiff was documented to be "doubled over with abdominal pain" and crying out that "I cannot take it no more." (Id. p. 17) By August 1, 2000, the plaintiff's medical records document that he was literally "crying" from the agony of his abdominal pain and was "very weak". (Ibid.)

On August 14, 2000, the plaintiff's medical records documented that he had a "long history of...cancer, blockage, vomiting, diarrhea." (Id. pp. 18, 25)

On August 9, 2000, the plaintiff's medical records document that he was found lying on his side on the floor of his cell, complaining of abdominal pain and

vomiting. He was taken to the medical unit of his prison by stretcher. (Id. pp. 19-20) The plaintiff remained in the hospital unit until August 21, 2000. (Id. p. 21)

While on the hospital unit, on August 11, 2000, the plaintiff's medical records again documented the presence of an abdominal mass above and to the right of his navel. (Id. p. 22) The plaintiff's medical records document that on August 11, 2000, the abdominal mass from which the plaintiff suffered was tentatively diagnosed as colon cancer. (Ibid.)

Based upon the plaintiff's documented history of more than two years of unremitting agony, the documentation of an abdominal mass, and the conclusion of the examining physician that the mass was colon cancer, a "Utilization Review Request" for an abdominal CT scan was submitted to defendant Blanchette on August 11, 2000. It was <u>not</u> marked "urgent". (Id. p. 23) It was eleven (11) days before defendant Blanchette's Utilization Review Committee approved an abdominal CT scan for the plaintiff. (Id. p. 28) Meanwhile, as the days wore on, the plaintiff continued vomiting a "green liquid" in his hospital unit bed and producing bloody stool. (Id. pp. 24, 26) Defendant Pillai, however, continued to look for kidney stones. (Id. p. 27)

Defendant Pillai discharged the plaintiff back into the general prison population one day before the abdominal CT scan had been authorized. (Id. p.

29) Days later, the plaintiff was back in the prison hospital unit, unable to walk unassisted, with "severe epigastric 'burning all night long,'...vomiting + diarrhea...." He had not eaten in four (4) days and was pale. (Id. p. 31) Two days later, defendant Pillai again discharged the plaintiff back into the general prison population. The abdominal CT scan still had not been conducted. (Id. p. 33)

On September 8, 2000, the block officer called the medical unit to report his concerns that the plaintiff was suffering from abdominal pain. Because he was not vomiting at that time, he was sent back to his cell. (Id. p. 34) Meanwhile, on September 7, 2000, the plaintiff at last received his abdominal CT scan at the John Dempsey Hospital. The CT scan was read that very day. It showed a "3.2 cm x 5.0 cm x 4.4 cm soft tissue mass in the right side of the abdomen at the level of approximately L2. This density is adherent to several loops of small bowel and the mesenteric fat is 'dirty' immediately next to it. This density most likely represents a neoplastic process originating from the mesentery versus small bowel." In other words, colon cancer. (Id. pp. 35-36)

That report was not read and initialed by defendant Pillai for more than a week – on September 15, 2000. (Id. p. 37) Meanwhile, the plaintiff continued to suffer and his sufferings were at times mocked by medical staff, scoffing at his claims of weight loss, for example. (Id. p. 34) The day that defendant Pillai

11

finally got around to reading and initialing the report of the results of the plaintiff's abdominal CT scan, defendant Blanchette's Utilization Review Committee approved a "surgical consult" for the plaintiff. (Id. p. 38) That authorization by defendant Blanchette's committee, however, could not go into effect without the approval of defendant Pillai. Defendant Pillai did not bother to sign off on it until late September, 2000, almost two weeks later, during which time the plaintiff continued to suffer. (Ibid.)

The surgeon at the University of Connecticut Health Center immediately concluded that the plaintiff's abdominal pain and diarrhea was "probably related" to his cancer. (Id. p. 39)

Despite the fact that all the foregoing events had taken place before the end of September, 2000, and defendant Blanchette's admission that he was personally involved during that period, the plaintiff was left to suffer in his cell throughout the entire month of October, 2000, and most of the month of November. (Id. p. 40) The plaintiff was not taken for surgery until November 21, 2000. The cancer was immediately located and removed that day by Dr. David L. Giles. (Id. pp. 41-42)

Even if the two defendants were absolved of responsibility for everything that happened to the plaintiff before the abdominal CT scan confirmed his colon cancer on September 17, 2000, their shocking refusal to provide him with

anything to alleviate his suffering for a full two additional months should be enough to offend even the most hardened sensibility. They make no effort to explain that whatsoever.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turney v. Safley, 482 U.S. 78, 84 (1987). Liscio v. Warren, 901 F.2d 274 (2d Cir. 1990), involved a jail physician's failure to distinguish between heroin withdrawal and the far more life-threatening withdrawal from alcohol. Liscio, withdrawing from alcohol and suffering severe DT's, was chained to a bed and treated as though he were withdrawing from heroin. The district court granted summary judgment to the defendants, finding this no more than a routine medical malpractice case, but the Second Circuit, noting that the fact Liscio was withdrawing from alcohol was apparent from his jail records, found the case to be an example of deliberate indifference to serious medical needs, actionable under Section 1983. See also Lancaster v. Monroe County, 116 F.3d 1419 (11th Cir. 1997) (fatal delay in providing medical care to chronic alcoholic who died of untreated DTs was actionable). Typically, deliberate indifference is egregious enough to be apparent to a lay jury without the help of experts. Natale v. Camden County Correctional Facility, 318 F.3d 575 (3rd Cir. 2003).

Denial of medical treatment when an inmate has serious medical needs violates the Eighth Amendment's prohibition on cruel and unusual punishment. Chance v. Armstrong, 143 F.3d 698 (2d Cir. 1998) (failure to provide adequate dental care, resulting in pain, inability to chew properly, and consequent extraction of a tooth); Koehl v. Dalsheim, 85 F.3d 86 (2d Cir. 1996) (Newman, C.J.) (denial of eyeglasses needed to treat serious eye condition); Hathaway v. Coughlin, 37 F.3d 63 (2d Cir. 1994); Austin v. Johnson, 328 F.3d 204 (5th Cir. 2003) (two-hour delay in summoning medical treatment for unconscious inmate suffering from heat stroke); Harris v. Hegmann, 198 F.3d 153 (5th Cir. 1999) (ignoring requests for immediate treatment of broken jaw); Ralston v. McGovern, 167 F.3d 1160 (7th Cir. 1999) (guard's refusal to give inmate medication pre-scribed to alleviate pain caused by radiation treatment for Hodgkin's disease); Reed v. McBride, 178 F.3d 849 (7th Cir. 1999) (denial of life-sustaining medication previously prescribed by outside physician); Roberson v. Bradshaw, 198 F.3d 645 (8th Cir. 1999) (prison doctor continued to prescribe medication despite knowledge that inmate was suffering adverse reaction to it); Cooper v. Schriro, 189 F.3d 781 (8th Cir. 1999) (denial of dental treatment for painful cracked and decayed teeth); Miller v. Schoenen, 75 F.3d 1305 (8th Cir. 1996); Lopez v. Smith, 203 F.3d 1122 (9th Cir. 2000) (intentional interference with previously prescribed medical treatment); Wakefield v. Thompson, 177 F.3d

1160 (9th Cir. 1999) (denial to discharging inmate of a sufficient supply of prescription psychotropic medication to sustain him until he could get a new prescription on the outside); Hunt v. Uphoff, 199 F.3d 1220 (10th Cir. 1999) (inadequate treatment of diabetes and hypertension); Brown v. Zavaras, 63 F.3d 967 (10th Cir. 1995) (denial of treatment for gender dysphoria); Steele v. Shah, 87 F.3d 1266 (11th Cir. 1996); Harris v. Coweta County, 21 F.2d 388 (11th Cir. 1994); Howard v. Headly, 72 F. Supp. 2d 118 (E.D.N.Y. 1999) (Block, J.) (prison officials required inmate to perform sanitation duties despite physician's orders to the contrary).  Delay in providing care -- a factor in many prison cases --  is itself actionable.  Estate of Rosenberg v. Crandell, 56 F.3d 35 (8th Cir. 1995) (fatal delay in treating esophageal carcinoma); Boyd v. Knox, 47 F.3d 966 (8th Cir. 1995) (three-week delay in treating infected wisdom tooth); Patterson v. Pearson, 19 F.3d 439 (8th Cir. 1994).

"Ordinarily, a tooth cavity is not a serious medical condition, but that is at least in part because a cavity is so easily treatable.  Absent intense pain or other exigency, the treatment of a cavity (in or out of prison) can safely be delayed by the dentist's schedule or the patient's dread or neglect, can be subject to triage or the management of care, can be mitigated or repaired temporarily, and can be coordinated with other related conditions that need to be treated together.  Nevertheless, a tooth cavity is a degenerative condition, and if it is left untreated

15

indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction....Consequently, because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000) (Jacobs, J.).

"We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain.  We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one." Brock v. Wright, 315 F.3d 158, 163 (2d Cir. 2002) (refusal to treat a painful keloid scar at the site of a knife wound).

Applying these long established standards to the facts of the present case, viewed in the light most favorable to the plaintiff's position, the conduct of the two defendants here obviously violated Mr. Hart's Eighth Amendment rights. At some point, long before appropriate medical intervention was initiated, they knew he was suffering unremitting agony and that cancer was the cause of it. At best, they delayed and delayed and delayed providing urgently needed treatment. They let him suffer. They knew he didn't have an ulcer – Blanchette

by the summer of 1999 and Pillai by early 2000 – but they continued to treat him as though that were his malady. They knew he didn't have kidney stones, in the same time frame, but they continued to assume that was the only differential diagnosis. They ignored plain notices in their own medical records as early as 1998 that he had an abdominal mass that seemed like cancer, but they performed no tests. They continued to treat him for conditions they knew he did not have. This is worse than Liscio and the plaintiff suffered agonies no one should have to endure because the defendants turned their backs on him.

For the defendants to claim qualified immunity on facts like these is ludicrous. "A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him is not prohibited by federal law...; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct...; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 36 (2nd Cir. 2003) (citations, quotation marks and ellipses omitted). There is no way that the defendants qualify under any of the three grounds for this affirmative defense on which they have the burden of proof. Gomez v. Toledo, 446 U.S. 635, 640 (1980); Harlow v. Fitzgerald, 457 U.S. 800 at 815 (1982); Schechter v. Comp-

troller of the City of New York, 79 F.3d 265, 270 (2d Cir. 1996); Black v. Coughlin, 76 F.3d 72, 75 (2d Cir. 1996); Castro v. United States, 34 F.3d 106, 111 (2d Cir. 1994).

The motion for summary judgment must be denied.

Respectfully submitted:

_____
JOHN R. WILLIAMS (ct00215)
51 Elm Street
New Haven, CT 06510
(203) 562-9931
FAX: (203) 776-9494
E-Mail: jrw@johnrwilliams.com
Plaintiff's Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Neil D. Parille, Esq., Assistant Attorney General, 110 Sherman Street, Hartford, CT 06105.

_____
JOHN R. WILLIAMS