**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| WILFRED L. HART | : | NO. 3:01CV2330(JCH) |
| | : | |
| VS. | : | |
| | : | |
| EDWARD BLANCHETTE, MD AND | : | |
| OMPRAKASH PILLAI, MD | : | MAY 7, 2004 |

**THE DEFENDANTS' REPLY MEMORANDUM IN**
**SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

In his opposition to the defendants' motion for summary judgment, the plaintiff states

that this case constitutes a "shocking denial of desperately needed medical treatment."  (Pl.'s

Mem. at 1.)  Although the plaintiff continues to maintain that the entire course of treatment

displays deliberate indifference to his medical needs, he focuses on the time period from

September 7, 2000 (when the CT scan indicated that he likely had cancer) until November 21,

2000, when Dr. David Giles performed an exploratory laparotomy and discovered the presence

of a carcinoid cancer.  (See Pl.'s Mem. at 12-13.)  It is the plaintiff's argument that during this

time the defendants knew he had cancer and deliberately delayed treatment to force him to

suffer.  This argument is without merit and misconstrues both the chronology of the case and the

role of the defendants in the decisions to treat the plaintiff.

**II.    SUPPLEMENTAL FACTS**

As indicated in the defendants' memorandum of law in support of their motion for

summary judgment, the plaintiff had a lengthy history of gastrointestinal problems.  Various

DOC physicians, including the defendant Dr. Omprakash Pillai, suspected that he had a peptic

ulcer.  However, on August 11, 2000, Dr. John Gittzus felt a mass in the plaintiff's abdomen which he suspected was cancerous.  (Aff. of Pillai, dated May 5, 2004,  ¶ 6.)  On August 11, Dr. Gittzus requested a CT scan on the plaintiff's abdomen from the Utilization Review Committee ("URC").  (Id., ¶ 7.)  On August 22, 2000, the URC approved Dr. Gittzus' request for the CT scan.  (Id., ¶ 8.)

On September 7, 2000, a CT scan was performed on the plaintiff's abdomen. (Id., ¶ 9.) Dr. Mark Kane prepared a Diagnostic Radiological Report detailing the findings on September 12.  It states that the plaintiff "most likely" had a "neoplastic process originating from the mesentery process."  A "neoplastic process" is cancer.  (Id., ¶ 10.)  The Report was faxed to Osborn (where Dr. Pillai was stationed) on September 13.  (Id., Ex. C.)

On September 15, 2000, Dr. Pillai requested a surgical consult for the plaintiff based on the Radiological Report.  (Id., ¶ 11.)  That day, the URC approved the surgical consultation.  (Id., ¶ 12.).

On September 27, 2000, Dr. Giles performed the surgical consultation.  He recommended that the plaintiff should have an exploratory laperotomy to determine if the mass was cancerous. (Id., ¶ 13.)  He requested approval for surgery from the URC.

On  October 4, 2000, the URC approved the request for surgery.  (Id., ¶ 14.)  The URC directed that the surgery take place on or after October 12.  (Aff. of Cheryl Malcolm, ¶ 19.)  Both the URC and Dr. Giles determined that the surgery was to be performed on a non-emergency basis.  Surgery to remove a cancerous mass such as that which was suspected here is normally

done on a non-emergency basis.  (Aff. of Pillai, ¶ 19.)  Dr. Giles did not consult with Dr. Pillai concerning the scheduling of the surgery.  (<u>Id</u>., 18.)

On November 21, 2000, Dr. Giles performed the laparotomy.  He found that the plaintiff had a carcinoid cancer of the bowel, with a single mestasis to the liver surface.  (<u>Id</u>., ¶ 15.)

From the time that Dr. Gittzus detected a mass in the plaintiff until the surgery was performed, Dr. Pillai believed it was necessary to rule out other causes of the plaintiff's symptoms.  (<u>Id</u>., ¶ 16.)  For this reason, on August 16 and September 15, Dr. Pillai submitted URC requests to have a gastrointestinal consult and a barium enema.  (<u>Id</u>., ¶ 17.)  The URC approved this request.  (Aff. of Malcolm, ¶ 14.)

Dr. Pillai treated the plaintiff's symptoms as necessary prior to the surgery.  (Aff. of Pillai, ¶ 19.).  For example, during the period from August through November 2000, he prescribed various medications including Tagamet, Reglan, Bentyl and Tylenol to control the plaintiff's gastrointestinal symptoms.  (<u>Id</u>., ¶ 20.)  This treatment was medically appropriate. (Aff. of Edward Blanchette, Expert Report.)

## III.   <u>ARGUMENT</u>

### A.    <u>Summary Judgment is Appropriate in Favor of Dr. Blanchette</u>

The plaintiff's attempt to show that defendant Edward Blanchette had personal involvement in the treatment decisions at issue are factually and legally flawed.

The plaintiff's first argument is that Dr. Blanchette is personally involved in this case because he was notified on August 23, 1999 that the plaintiff was ill and there were difficulties finding an appropriate hospital.  (<u>See</u> Aff. of Pillai dated March 17, 2004, Ex. B, Clinical Record

at August 23, 1999 entry.)  The fact that Dr. Blanchette was contacted that an inmate had to be taken to the hospital does not change the fact that he was not responsible for any of the treatment decisions at issue.

The plaintiff next attempts to hold Dr. Blanchette liable by referring throughout his memorandum to "defendant Blanchette's medical staff," see pages 7-9, or "defendant Blanchette's Utilization Review Committee," see pages 10 and 12.  This is a transparent attempt to impose respondeat superior liability on Dr. Blanchette.  It is well-established that there is no respondeat superior liability for § 1983 actions.  In addition, with respect to the characterization of "defendant Blanchette's Utilization Review Committee," the plaintiff is in error.  Dr. Blanchette is employed by the Department of Correction. He was not a member of the URC during the August through November 2000 time period and did not supervise the URC.  (Aff. of Cheryl Malcolm, ¶ 8.)  He had no personal involvement in the decisions in question and therefore is not a proper party to a § 1983 action.

B.    Summary Judgment is Appropriate in Favor of Dr. Pillai

With respect to Dr. Pillai, the plaintiff's arguments are equally unavailing.  Because Dr. Pillai familiarized himself with the plaintiff's medical chart in February 2000, the plaintiff asserts that he "knew" that the plaintiff "probably" had cancer.  (Pl.'s Mem. at 2.)  However, the evidence is undisputed that the plaintiff was not diagnosed with a cancerous mass at that time and no physician believed he had cancer.  The plaintiff points to a Diagnostic Radiological Report prepared on January 28, 1999.  This report states:

ABDOMEN:
A single, flat place examination of the abdomen is reviewed. There appears to be a bony fusion from L4 to S1. The clinical history raises concern for a mass. On this plain film study, I see no evidence of a displaced gaseous structures or evidence of a mass. Obviously, this does not exclude the potential for a mass.

CONLUSION:
Normal appearing flat plate examination of the abdomen.

This study was seen an interpreted with Gale R. Ramsby, M.D.

(Aff. of Pillai, Ex. A.)[1] This report was negative for "a mass."

Next, the plaintiff asserts that during the time from which the CT scan found that he likely had cancer until the surgery on November 11, 2000, Dr. Pillai permitted the plaintiff to suffer. First, Dr. Pillai did no such thing. He prescribed the plaintiff medication to treat his gastrointestinal symptoms. Second, and more fundamentally, the plaintiff misconstrues Dr. Pillai's role. The decision to approve the CT scan, the surgical consultation, and the surgery were not taken by Dr. Pillai. These decisions are within the authority of the URC. (Aff. of Malcolm, ¶ 6.)

In any event, Dr. Pillai is not a surgeon. (Aff. of Pillai, ¶ 3.) The URC approved the surgical consultation and it was performed by Dr. Giles. Based on Dr. Giles' recommendation, the URC approved surgery. Dr. Giles scheduled the surgery on a non-emergency basis, after meeting with the plaintiff and discussing his symptoms. (Id,. Ex. E.) While the plaintiff may be

---

[1] The plaintiff appears to question the adequacy of the type of x-ray utilized. (See Pl.'s Mem. at 8.) Since neither the plaintiff nor his counsel are physicians, their arguments carry no medical weight.

unhappy about timing of the CT scan and the surgery, these decisions were outside of the control of Dr. Pillai.

Dr. Pillai's only role in the URC process leading to the decision to undertake surgery in this case was his request for a surgical consult.  On September 13, Dr. Kane's Radiological Report was faxed to Osborn.  On September 15, Dr. Pillai initialed the results and requested approval for a surgical consult from the URC.   That same day, he also requested a barium enema to rule out other causes of the plaintiff's symptoms.  Although the plaintiff appears to ridicule Dr. Pillai's concern for kidney stones, Pl.'s Mem. at 10, this shows Dr. Pillai's determination to adequately diagnose the plaintiff's condition.

The plaintiff makes other arguments that deserve attention because of their mischaracterization of the record.

• The plaintiff maintains that during a visit to medical in June 1998 his stomach complaints were ignored and the medical staff instead referred to the fact that he was a convicted child molester.  (Pl.'s Mem. at 7.)  A review of the June entries (which predate Dr. Pillai's association with the DOC) indicates that this is not the case.  There are no references to the fact that the plaintiff is a sex offender.  However, Nurse Practitioner Bianchi does write on June 21, 1998 that she will consult with Dr. Monica Farinella, who is a physician well-qualified in gastrointestinal matters.  (See Aff. of Blanchette, Expert Report.)  Further, the very page indicates that other tests had recently been performed which were negative.  Indeed, the full record, which is attached to Dr. Pillai's affidavit dated March 17, 2004, indicates that three days

later the plaintiff was a "no show" for a medical call.  (The copy attached to the plaintiff's submission does not show this later entry.)

• The plaintiff asserts that his medical records "document[] that he had a 'long history of . . . cancer, blockage, vomiting, diarrhea.'"  (Pl.'s Mem. at 9.)  However, the medical record to which the plaintiff refers is the plaintiff's <u>own description</u> of his condition during the course of mental health treatment.

• The plaintiff asserts that DOC physicians knew that he had cancer by August 11, 2000, when Dr. Gittzus felt the mass.  (Pl.'s Mem. at 10.)  However, the clinical entry for the period indicates only that cancer was suspected.  (<u>See</u> Aff. of Omprakash Pillai, dated March 17, 2004, Clinical Record at entry dated 8/11/2000.)

• The plaintiff asserts that the authorization by "Blanchette's Utilization Review Committee" approving the surgical consult for the plaintiff "could not go into effect without the approval of defendant Pillai."  (Pl.'s Mem. at 12.)  This is in error.  The URC approval to which the plaintiff refers states on the bottom "URC Decision Must Be Reviewed by Facility-based MD Before Filing."  (Aff. of Pillai, Ex.C.)  This language merely means that a physician at the inmate's facility must review the document before it is placed in the medical record.  It does not mean that it had to be approved by Dr. Pillai.  (Aff. of Cheryl Malcolm, ¶ 12.)

It must be emphasized that the plaintiff's action is one of deliberate indifference to his medical needs in violation of the United States Constitution.  Claims of negligence are not actionable under § 1983.  <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).  Even if one assumes (and the defendants strenuously deny) that Dr. Pillai should somehow have discovered the cancer sooner,

a failure to diagnose claim sounds in negligence.  In addition, any claim that the plaintiff raises concerning the effectiveness of Dr. Pillai's treatment of his gastrointestinal symptoms prior to the surgery is likewise a claim of negligence.  Since Dr. Pillai neither scheduled the surgery or performed it, his role was to most effectively manage the plaintiff's symptoms until the date of the surgery.  He did this through the prescription of medicine and the request for a barium enema to rule out an ulcer.  Indeed, the defendants' expert, Dr. Edward Blanchette, has opined that the treatment that afforded the plaintiff prior to the detection of the cancer was appropriate.  (Aff. of Edward Blanchette, Expert Report.)  The plaintiff has presented no evidence – either in the form of a medical expert or otherwise – to indicate that this treatment fell short of acceptable medical practice, much less constituted deliberate indifference to his needs.

Summary judgment is clearly mandated in this case when compared to the case on which the plaintiff places principal reliance, Liscio v. Warren, 901 F.2d 274 (2d Cir. 1990).  In Liscio, the plaintiff, a pretrial detainee, was suffering from alcohol withdrawal and was in a delirious state.  The Court of Appeals held, based on an affidavit from the plaintiff's medical expert, that a jury could find that the plaintiff was in an "emergency situation" and the defendant's failure to examine him over a three-day period went beyond negligence and constituted deliberate indifference.  Needless to say, the facts in Liscio are dramatically different from those in the case at bar.  First, the plaintiff here does not have an expert to testify on his behalf that the defendants' conduct was negligent, much less displayed deliberate indifference.  Second, the Court of Appeals contrasted the plaintiff's medical condition with that presented in Estelle v. Gamble:

> Estelle is not to the contrary. Since the inmate in that case had a back condition that was neither life-threatening nor fast-degenerating, his eleven visits with physicians over a three-month period was evidence that the medical care he received could not constitute deliberate indifference.

Id. at 277. The plaintiff in the case at bar did not have a life-threatening or fast-degenerating condition as is indicated by the fact that the CT scan, surgical consultation, and surgery were scheduled on a non-emergency basis. They were all performed within a three-month period. Following Estelle and Liscio, the care provided the plaintiff "could not constitute deliberate indifference."

      C.     Qualified Immunity

      The defendants again emphasize that to the extent that the court finds that their actions were violative of the United States Constitution, they are protected by the doctrine of qualified immunity. The record shows that Dr. Blanchette was notified at most once of the plaintiff's condition. Nothing in the entry for that record indicates that the plaintiff was receiving inappropriate care. He certainly is entitled to trust the medical staff at the facility that appropriate treatment was afforded the plaintiff. The same can be said of Dr. Pillai. Dr. Pillai followed the procedure set forth by the URC in requesting approval for various medical procedures. The plaintiff may assert that Dr. Pillai should have protested that the CT scan, the surgical consultation, or the surgery be done on an emergency basis. The undersigned is unaware of any case that indicates that a non-surgeon in Dr. Pillai's position is obligated to protest the decision of a surgeon and medical review committee which have determined that certain medical procedures are to be taken on a non-emergency basis.

### III.   CONCLUSION

For the reasons set forth above and in the defendants' initial memorandum, there are no material issues of fact in dispute.  The medical treatment afforded the plaintiff was medically appropriate and in no sense can be considered deliberately indifferent.

DEFENDANTS
Edward Blanchette, MD and
Omprakash Pillai, MD

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:___/s/_____
Neil Parille
Assistant Attorney General
Fed. Bar No. 15278
110 Sherman Street
Hartford, CT  06105
Telephone No.:  (860) 808-5450
Fax No. (860) 808-5591
E-mail:  neil.parille@po.state.ct.us

### CERTIFICATION

I hereby certify that a copy of the foregoing was sent by first-class mail, postage prepaid, this  7th day of May, 2004, to:

John R. Williams, Esq.
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT  06510


___/s/_____
Neil Parille
Assistant Attorney General